UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X
ROMUS ATKINS, MARK BELLOTTO, DAWN BROWN,:
JANE BROWN, MICHAEL J. CROCI, JR.,
MICHAEL P. KRACHT and ROBERT GRASSFIELD,:

                    01 Civ. 11536 (WCC)

            Plaintiffs,   :

     - against -        :     **OPINION**
                             <u>**AND ORDER**</u>

COUNTY OF ORANGE, CHRIS ASHMAN,   :
Commissioner of Mental Health, sued in
his individual and official capacities, :
DONNA DOMINICK, ROBERT CURRERI, DAVID
SERRANO, PAUL WEISSINGER, MICHAEL     :
ZAPPOLO, KATHLEEN FERRERI, ARTHUR
CONKLIN, KEITH PELTON, JENNIFER SERGI, :
KANDI JONES, KRISTY KELLY, MICHAEL
ANDRICUT, DANIEL FIGUEROA, EDWARD    :
CRAVEN, RICHARD RUSSELL, BRYCE SOTELO,
LOU PASTOR, VINCENT DICHAIRO, LAWRENCE :
CATLETTI, ROBERT TICHY and GERALD
KEHLENBECK,                    :

            Defendants.  :
- - - - - - - - - - - - - - - - - - - - X

**A P P E A R A N C E S :**

        THORNTON, BERGSTEIN & ULLRICH
        **Attorneys for Plaintiffs**
          **Mark Bellotto, Dawn Brown, Jane**
          **Brown, Michael J. Croci, Jr.,**
          **Michael P. Kracht and Robert**
          **Grassfield**
        15 Railroad Avenue
        Chester, New York 10918

SCOTT A. THORNTON, ESQ.
HELEN ULLRICH, ESQ.
STEPHEN BERGSTEIN, ESQ.

        Of Counsel

        DUPÉE, DUPÉE & MONROE, P.C.
        **Attorneys for Plaintiff**
          **Romus Atkins**
        30 Matthews Street
        P.O. Box 470
        Goshen, New York 10924

JAMES E. MONROE, ESQ.
WILLIAM GARVIN, ESQ.

        Of Counsel

*Copies Mailed to Counsel of Record*

COUNTY ATTORNEY, ORANGE COUNTY
**Attorneys for Defendant**
  **COUNTY OF ORANGE**
255 Main Street
Goshen, New York  10924

DAVID L. DARWIN,
  Acting County Attorney

      Of Counsel

M<sup>c</sup>CABE & MACK LLP
**Attorneys for Defendant**
  **CHRIS ASHMAN, sued in his**
  **individual and official**
  **capacities**
63 Washington Street
P.O. Box 509
Poughkeepsie, New York  12602-0509

DAVID L. POSNER, ESQ.

      Of Counsel

BURKE, MIELE & GOLDEN, LLP
**Attorneys for Individual**
  **Correctional Officer Defendants,**
  **sued in their individual**
  **capacities**
30 Matthews Street, Suite 303A
P.O. Box 216
Goshen, New York  10924

MICHAEL K. BURKE, ESQ.

      Of Counsel

**CONNER, Senior D.J.:**

Plaintiffs Romus Atkins, Mark Bellotto, Dawn Brown, Jane Brown, Michael J. Croci, Jr., Michael P. Kracht and Robert Grassfield (collectively the "plaintiffs") bring this action against numerous corrections officers (the "CO defendants"),[1] the County of Orange (the "County") and Chris Ashman, the County Commissioner of Mental Health.[2] Plaintiffs assert claims pursuant to 42 U.S.C. § 1983 for violations of their rights under the Eighth and Fourteenth Amendments. The CO defendants are sued in their individual capacities and Ashman is sued in both his individual capacity and his official capacity. In the present motion, defendants move pursuant to FED. R. CIV. P. 37 to preclude the testimony of plaintiffs' expert and pursuant to FED. R. CIV. P. 56 for partial summary judgment dismissing plaintiffs' claims. In addition, defendants move to sever each individual plaintiff's claims for separate trials and, in the alternative, the CO defendants move to sever trial of the claims against the CO defendants from those against the County defendants. For the reasons stated hereinafter, defendants' motions are granted in part and denied in part.

## BACKGROUND

### I.    Plaintiffs' Factual Allegations

Plaintiffs were incarcerated at the Orange County Correctional Facility (the "Jail") at various

---

[1] The CO defendants include Donna Dominick, Robert Curreri, David Serrano, Paul Weissinger, Michael Zappolo, Kathleen Ferreri, Arthur Conklin, Keith Pelton, Jennifer Sergi, Kandi Jones, Kristy Kelly, Michael Andricut, Daniel Figueroa, Edward Craven, Richard Russell, Bryce Sotelo, Lou Pastor, Vincent DiChairo, Lawrence Catletti, Robert Tichy and Gerald Kehlenbeck. However, the parties stipulated to the dismissal of Paul Weissinger and Edward Craven from the action without costs. (Burke Affm., Ex. B.)

[2] The County and Ashman are referred to collectively as the "County defendants" and all of the defendants are referred to collectively as the "defendants."

1

times between 1999 and 2002. (Complt. ¶¶ 11-17.)[3]  While incarcerated, each plaintiff was under

the care of the Orange County Department of Mental Health ("DMH"), which operates and staffs

the forensic mental health clinic (the "forensic clinic") at the Jail.  Plaintiffs allege that the County

had a policy or practice of deliberate indifference to the mental health needs of prisoners at the Jail

that resulted in violations of their rights under the Eighth and Fourteenth Amendments.  Four of the

plaintiffs also allege that the County's deliberate indifference to their mental health needs caused

episodes of irrationality or insanity that resulted in their being beaten or otherwise mistreated by

certain CO defendants in violation of the Eighth and Fourteenth Amendments.  The following factual

allegations appear in plaintiffs' Complaint.


### A.    Allegations Pertaining to Plaintiffs With Excessive Force Claims

Atkins suffers from schizophrenia and bipolar disorder.  (*Id*. ¶ 43.)  On April 16, 2001, he

was incarcerated at the Jail and immediately referred to the forensic clinic.  (*Id*. ¶ 44.)  On April 17,

2001, a forensic clinic psychiatrist evaluated Atkins, diagnosed him with "chronic, undifferentiated

schizophrenia with acute exacerbation" and prescribed medication.  (*Id*. ¶ 45.)  Atkins refused his

medication, but no action was taken when DMH was informed of his refusal.  (*Id*.)  Atkins then

experienced a psychotic episode.  (*Id*. ¶ 46.)  On April 18, he was placed in a cell called "the

bullpen" and pepper spray was directed at his eyes.  (*Id*. ¶ 47.)  He was then placed in a therapeutic

restraint without medical authorization, shackled and handcuffed.  While Atkins was restrained, CO

defendants Curreri, Catletti, Tichy and Kehlenbeck allegedly beat him.  (*Id*.)  Sometime thereafter,

---

[3] All references to the "Complt." or to the "Complaint" are to plaintiffs' Third Amended
Complaint.

Lieutenant Joseph Williams transported Atkins to the forensic clinic, explained that Atkins's inappropriate behavior was a direct result of his mental condition and demanded that the prisoner receive treatment. Plaintiffs allege that Atkins did not receive treatment for his mental condition until April 20. (*Id.* ¶ 48.)

Dawn Brown was an inmate at the Jail on several occasions during the relevant period and suffers from schizoaffective disorder and bipolar disorder. (*Id.* ¶¶ 63-64.) On April 19, 2000, Dawn Brown was behaving irrationally and was referred to the forensic clinic. (*Id.* ¶ 69.) The nursing staff placed her on close watch, but she was not treated by a psychiatrist until April 24, 2000, five days later. (*Id.* ¶¶ 67-68.) On two other occasions during her incarceration, Brown refused treatment and DMH took no further steps to provide her with care. (*Id.* ¶¶ 73, 77.) On April 12, 2001, Dawn Brown was placed in restraints after she was found in a highly agitated state. Plaintiffs allege that after she was shackled, handcuffed and a helmet was placed upon her head, CO defendants Dominick, Curreri, Serrano and Weissinger beat her. (*Id.* ¶ 78.) On April 26, 2001, Dawn Brown was again placed in the bullpen, restrained and allegedly beaten by CO defendants Zappolo, Ferreri, Conklin and Pelton after she smeared feces on the walls of her cell. (*Id.* ¶ 79.) At some point during her incarceration, Dawn Brown was confined to medical "keeplock" isolation which according to plaintiffs was the result of DMH's failure to provide treatment. (*Id.* ¶ 82.) CO defendants Sergi, Jones and Kelly allegedly turned off the water supply to Dawn Brown's keeplock unit, denying her drinking water for several days. The officers also threw her food "through a slot in her door" and refused to allow her to shower. Dawn Brown alleges that she was beaten when she did not cooperate with the prison guards. (*Id.*)

Croci was incarcerated at the Jail from May 29, 1999 until March 2000, and from May 15,

2001 until September 2001. During the relevant periods, he suffered from bipolar disorder, claustrophobia and anxiety. (*Id*. ¶¶ 94-96.) Upon his incarceration in May 1999, Croci was referred to DMH for treatment "ASAP," but he was not seen by a doctor until many days later. (*Id*. ¶ 99.) When he was finally examined, he was administered a number of prescribed medications that left him in an "almost constant state of somnolence." (*Id*. ¶ 100.) During his incarceration in 2001, Croci was seen by DMH personnel but there was no follow-up treatment even though he refused medication. (*Id*. ¶¶ 106, 109-10.) On June 16, 2001, Croci had a psychotic episode which plainitffs allege was caused by his failure to take his medication. (*Id.* ¶ 104.) CO defendants Andricut, Figueroa and Craven allegedly beat Croci so severely in connection with this episode that he was transported to a community hospital emergency room. Upon Croci's return to the Jail, he was placed in the bullpen and restrained because no psychiatrist was available to prescribe the drugs that he required. (*Id*. ¶ 105.)

Grassfield was incarcerated from January 11, 2002 until March 2002. (*Id.* ¶ 134.) During this period, he suffered from bipolar disorder and post-traumatic stress disorder. (*Id.*) Upon incarceration, Grassfield informed the booking officer that he required certain medications and provided his medications to the officer. (*Id.* ¶ 137.) Once he was in the inmate population, Grassfield made repeated requests for medication but was denied medication and treatment for four days. (*Id.* ¶¶ 138-40.) When the proper medications were finally prescribed for him, he received them only sporadically. (*Id.* ¶ 141.) As a result, Grassfield suffered from severe depression and attempted suicide on February 4, 2002. (*Id.* ¶ 146.) He was then allegedly beaten by an unnamed corrections officer who discovered his suicide attempt. (*Id.* ¶ 147.) After several inmates threatened him in an unrelated incident, Grassfield was placed in "keeplock" isolation. (*Id.* ¶ 149.) While in

isolation, his medications were not properly dispensed and Grassfield continually asked to be reintroduced to the general inmate population. (*Id.* ¶¶ 150-51.) On February 10, 2002, Grassfield attempted to hang himself from the Jail's sprinkler system using a sheet that he had fashioned as a noose. (*Id.* ¶ 152.) His weight caused the pipe to break and he was sprayed with water and chemicals. (*Id.* ¶ 153.) According to Grassfield, after observing the spectacle for a period of time, CO defendants Russell, Sotelo, Pastor and DiChairo allegedly shackled him and beat him as they dragged him to the medical unit. (*Id.*)

### B. Allegations Pertaining to Plaintiffs Without Excessive Force Claims

Kracht has been incarcerated at the Jail more than ten times. (*Id.* ¶¶ 113-14.) He suffers from bipolar disorder. (*Id.* ¶ 112.) Upon incarceration in July 2001, it is alleged that Kracht was denied medication for a week despite the fact that DMH was aware of his mental illness. (*Id.* ¶ 115.) When he was finally seen by a psychiatrist, the doctor ignored Kracht's previous mental health record, issued a new diagnosis of Kracht's mental conditions and prescribed several psychotropic medications for him. (*Id.* ¶¶ 116-17.) One of the drugs prescribed for him was Elavil. (*Id.* ¶ 118.) Although this drug requires careful monitoring, Kracht did not see a DMH psychiatrist until three weeks after the drug was first prescribed. (*Id.* ¶ 118.) Kracht informed the DMH psychiatrist that he was experiencing side effects. (*Id.* ¶ 119.) Instead of weaning Kracht off the drug, the psychiatrist abruptly terminated the Elavil and prescribed Depakote, Neurotin and Seroquel. (*Id.* ¶ 120.) DMH failed to closely monitor Kracht to determine how he was responding to these new drugs. (*Id.* ¶ 121.) On September 16, 2001, Kracht refused to take his medications but received no follow-up treatment. (*Id.* ¶ 123.) Thereafter, Kracht's medications were changed again and a

caseworker noticed that he was "sleeping day and night." (*Id.* ¶¶ 124-27.) No changes in his medications were made even after it was determined that Kracht was sleeping excessively. (*Id.* ¶¶ 128-32.)

Bellotto was a minor with no previous history of mental illness when he was incarcerated for a thirty-day sentence in 2000. (*Id.* ¶¶ 53-54.) Subsequent to his admission, a forensic clinic psychiatrist diagnosed Bellotto with depression and prescribed Paxil for him. (*Id.* ¶ 56.) Bellotto was not informed he could refuse the medication, (*id.* ¶ 57), although his mother protested the administration of the drug to her son. (*Id.* ¶ 58.) DMH continued to administer Paxil to Bellotto for the remainder of his sentence. (*Id.* ¶ 59.) Plaintiffs allege that during the relevant period, DMH routinely prescribed psychotropic drugs to inmates who had no need for them to "induce a state of stupor." (*Id.* ¶ 60.)

Jane Brown was an inmate at the Jail from March 30, 2001 to May 9, 2001. During that time, she suffered from cyclothymic disorder, panic disorder and post-traumatic stress disorder and was a recovering substance abuser. (*Id.* ¶¶ 86-88.) A psychiatrist at the forensic clinic prescribed Paxil for Jane Brown, but she frequently missed taking the drug because she was attending GED classes during the time it was distributed. (*Id.* ¶ 89.) Her request to have the distribution schedule changed went unheeded until one week before her release. (*Id.* ¶¶ 89-90.) DMH provided no discharge planning, and Jane Brown suffered withdrawal symptoms after release. (*Id.* ¶ 95.)

## C. The County Defendants' Alleged Knowledge of Treatment Failures

Plaintiffs allege that the County was deliberately indifferent to the mental health needs of mentally ill inmates at the Jail and failed to provide them with adequate mental health care in

violation of the Eighth and Fourteenth Amendments. They contend that Ashman and the County had direct knowledge of the treatment problems in the Jail, but failed to take any action. In 1995, Susan Menon, a nurse administrator working for the medical services contractor at the Jail, informed Ashman that the forensic clinic psychiatrists were routinely over-prescribing psychotropic drugs for inmates under their care. (*Id*. ¶ 30.) Menon contacted Ashman on another occasion two years later to apprise him of continuing problems at the forensic clinic. She advised Ashman that DMH was still over-medicating some prisoners and that many prisoners suffered significant delays in receiving treatment. She also told Ashman that DMH lacked an emergency backup treatment program and facilities. (*Id*. ¶ 31.) In 1998, Menon, along with another nurse, Lurana Berweger, informed Ashman that the problems in the forensic clinic were continuing. (*Id*. ¶ 32.)[4]

In the spring of 1997, Menon met with Deputy County Executive Toni Murphy. (*Id.* ¶ 38.) She explained the treatment problems occurring in the forensic clinic and provided memoranda that she had written to others in authority detailing the same problems. (*Id*.) Murphy told Menon that Joseph Rampe, who was the County Executive at the time,[5] would be shocked by this information and that it would be dealt with after his re-election. (*Id*. ¶ 39.) In July 1998, Berweger wrote a letter to Rampe outlining the same treatment problems she observed and included documentary support. (*Id*. ¶ 40.) According to plaintiffs, the County did not take any steps to rectify the alleged problems

---

[4] However, we note that with respect to the claims alleged in the present case, the earliest allegation pertains to alleged constitutional violations in 1999. Consequently, the probative value of these facts will be assessed accordingly with respect to the present summary judgment motion.

[5] Rampe was initially named as a defendant in this action, but this Court granted his motion to dismiss the claims asserted against him. *See Atkins v. County of Orange*, 251 F. Supp. 2d 1225, 1235 (S.D.N.Y. 2003) (Conner, J.).

in the forensic clinic prior to the commencement of the present action.

## II.    Defendants' Contentions Regarding Alleged Treatment Failures

The County defendants contend adequate mental health treatment was available to plaintiffs. The forensic clinic at the Jail employs clinicians as senior caseworkers,[6] staff social workers, support staff and a director, and contracts with psychiatrists who perform various consulting services. (County Defs. Mem. Supp. Summ. J. at 2.)   In addition, the County contracted with Dr. Ramachandran in the Fall of 2001 to perform quality assurance reviews and with Dr. Fruchter in early 2002 to provide on-call emergency psychiatric services whenever the forensic clinic was closed.  (*Id.*)  With respect to each plaintiffs' claims, the County defendants assert the following:

### A.    Atkins

Defendants maintain that "[a]lthough Atkins does not recall the intake procedures, the records are clear that he was properly and promptly processed and his mental health care began immediately upon admission." (*Id*. at 57.)  Atkins was admitted to the Jail on April 16th and on the same day he was assessed in booking, referred for mental health services and placed on "close watch" until mental health could see him.  He was then seen by medical staff which also made a mental health referral.  Atkins was seen by mental health on the 17th at which time a case file was opened and, with his consent, mental health received his records from prior treatment at Cornwall

---

[6] "The clinicians' job responsibilities involved conducting initial client screening, obtaining inmate medical records and verifying their medication, making referrals as needed to the psychiatrists, providing counseling services, conducting group therapy sessions and providing discharge planning for inmate clients soon to leave the jail."  (County Defs. Mem. Supp. Summ. J. at 2.)

Hospital.  (*Id*.)  Atkins was also seen by a psychiatrist on the 17th.  (*Id*. at 61.)

Notably, Atkins had no complaints about the medication he began taking at the Jail or the care he received from his mental health clinician, although plaintiffs' expert did state that the dosage Atkins was receiving was "woefully inadequate."  (*Id*. at 58; Thornton Affm., Ex. 29.)  Rather, Atkins's claim centers around an incident which occurred on April 18th after Atkins was yelling and screaming uncontrollably in his cell.  The forensic clinic records indicate that Atkins was seen by his case worker after being brought to the clinic from medical on the 18th shortly after the incident occurred and returned to his cell within one and one-half to two hours of being brought to the medical unit.  (County Defs. Mem. Supp. Summ. J. at 59, 61.)  In addition, defendants note that while Atkins alleges that the clinic refused to provide him with his medication, the medical records demonstrate that it was Atkins, himself, who did not follow up with the care recommended by Cornwall Hospital.  Therefore, defendants contend that Atkins was provided with constitutionally adequate mental health treatment.

**B.**  **Dawn Brown**

Defendants maintain that each of the five times Dawn Brown was incarcerated and alleged constitutional deprivations, she was a patient of the mental health clinic and "received timely and appropriate care . . . , even when she refused to be treated by medical and mental health staff."  (*Id*. at 63.)  With respect to Dawn Brown's April 19, 2000 incarceration, she was immediately evaluated for mental health issues and was referred to mental health.  (*Id*.)  She was also placed on "close watch" until she could be seen by a mental health professional.  (*Id*.)  The forensic records indicate that Dawn Brown requested mental health services and signed a voluntary application to the mental

health clinic on April 20, 2000, and that she was seen in the mental health clinic by a mental health clinician and a psychiatrist for evaluation on that same day. (*Id*. at 64.) Dawn Brown was again seen by a mental health clinician on April 24th and the clinician's notes indicate that this was the third time she had seen Brown since her arrival at the Jail. (*Id*. at 65.) In addition, Dawn Brown also saw the psychiatrist again, which was the second time in five days. (*Id*.) During this incarceration, Dawn Brown did not suffer, nor does she allege any injury or harm.

With respect to the other incarcerations, defendants contend that the record is replete with examples of how defendants attended to Dawn Brown's medical and mental health needs with constant supervision and counseling. Dawn Brown alleges that during her incarceration which began on October 31, 2000, she tried to hang herself. However, defendants note that there are no allegations that Dawn Brown did not receive proper and adequate mental health care during this particular incarceration. (*Id*. at 66.) Upon admission, Dawn Brown's mental health was screened by corrections officers and an "urgent/emergency" referral was made to mental health. (*Id*.) She was observed to be at an "elevated" risk for suicide and was placed on "close watch" in a "strip cell."[7] (*Id*.) Dawn Brown was seen by a psychiatrist and mental health case worker on the day she was admitted to the Jail. (*Id*.) Medication was prescribed for her by the psychiatrist, and she was directed to return to the clinic for follow-up in three weeks. The medication administration chart indicates that Dawn Brown was given her medication regularly. (*Id*. at 66-67.) Dawn Brown was seen by her mental health case worker and psychiatrist on two subsequent occasions after her initial screening at the clinic. The alleged attempted hanging by Dawn Brown occurred on November 24,

---

[7] A "strip cell" is a cell where all objects that could be used by an inmate to harm oneself are removed. (*Id*.)

2000.  Dawn Brown was found by corrections staff sitting on her bed with a sheet around her neck, not hanging.  (*Id*.)  Corrections staff removed Dawn Brown from her cell, placed her in a protective "strip cell" and put her on "extreme close watch" until she could be evaluated and seen by someone from mental health.  Dawn Brown was seen by her mental health case worker on November 27, 2000, and the mental health case worker noted that Dawn Brown admitted to her that "'she wasn't seriously considering suicide, she just wanted somebody's attention.'" (*Id*.)

Dawn Brown was next incarcerated from March 12, 2001 until March 19, 2001.  There are no allegations of constitutional deprivations during this incarceration other than the statement that Dawn Brown was again incarcerated and treated by the forensic clinic.  (*Id*. at 68.)  Dawn Brown was screened in booking for mental health issues and was put on "close watch" with a referral to mental health.  She was seen by a psychiatrist and mental health caseworker the next day and medication was prescribed for her by the psychiatrist.  (*Id*.)

Dawn Brown was incarcerated again on March 26, 2001.  She was immediately screened in booking for mental health issues and was placed on "close watch" with an urgent referral to mental health.  (*Id*. at 69.)  The medical charts indicate that while Dawn Brown was in the booking unit she began "acting out" and was placed in the "bullpen" which was a cell under constant supervision by correction officers.  The medical progress notes indicate that Dawn Brown was placed in a restraint chair with a helmet on her head, but defendants note that "[t]hese devices are used only by corrections staff when an inmate exhibits conduct that presents a danger to herself and others and requires restraint to prevent injury to herself or others."[8]  (*Id*. at 70.)  Dawn Brown was in the restraints for a little more than one hour.  (*Id*.)  The following day, March 27, Dawn Brown was seen

---

[8] Use of a restraint chair is sanctioned by the State Commission of Correction.  (*Id*. at 70.)

by a mental health clinician, but she later refused to be seen by a psychiatrist and refused all mental health services. (*Id*.) She also refused to submit to an intake medical/mental health screening, but it was eventually conducted on March 28. (*Id*.) Dawn Brown was released from the Jail on April 2, 2001.

The last incarceration in which Dawn Brown alleges constitutional deprivations began on April 4, 2001. (*Id*. at 71.) She was screened at booking for mental health problems and a referral was made to the mental health clinic. She was then taken to the medical unit, where it was again attempted to assess her mental health, but Dawn Brown refused. "She was observed to be 'screaming, shaking - banging at cell door' and was referred to mental health and to a psychiatrist and placed in medical keeplock and close watch." (*Id*. at 72.) Dawn Brown refused medical intake and was kept in medical "keeplock" until April 17 when she agreed to be screened and tested. "Until then, additional efforts to persuade Brown to be seen in medical on several occasions between April 7 and April 10 were rebuffed proving false the allegation that after April 4 there was 'no further effort to provide her treatment.'" (*Id*.) On April 12, Dawn Brown was seen by a nurse at her cell, and it is alleged that she screamed and lunged at the nurse. Defendants also maintain that Dawn Brown was observed by the corrections staff to be "shaking" and "banging at [the] cell door." (*Id*.) Corrections then made a referral to mental health, and Dawn Brown was seen by a mental health clinician, Jane Tiller. Tiller reported to corrections that Dawn Brown was "getting worse - loud, banging her head, refusing all medical services." (*Id*.) The corrections staff then decided that Dawn Brown needed to be restrained, and she was placed in the restraint chair for about two to three hours. (*Id*. at 73.) While in the restraint chair, a nurse tried to assess Dawn Brown's condition several times, but was resisted. A report of the incident was filed with the State Commission of Correction.

(*Id*. at 73.)  On April 12, Dawn Brown submitted to an examination by the staff psychiatrist and medication was prescribed for her.  Defendants note that even though Dawn Brown failed to voluntarily request mental health services, she was seen by a mental health clinician on April 13, April 16 and April 19, "each time in connection with disruptive and non-compliant misconduct." (*Id*.)  Dawn Brown was seen by a psychiatrist on April 25, who noted that she was refusing all medication.  (*Id*.)  On April 26, Dawn Brown threw feces and urine under her cell door and was placed in a restraint chair for her safety.  Defendants maintain that she was immediately attended to by a staff psychiatrist "who found her to be 'agitated and uncontrollable' and had smeared feces 'all over' and 'needed to be restrained.'" (*Id*.)  The staff psychiatrist then administered a STAT dose of Ativan, which was consistent with the emergency and accepted medical practice.  (*Id*.)  Dawn Brown admits that she banged her head against the wall and that this was the cause of her being restrained and given an injection of Ativan.  (*Id*. at 74.)  She also admits that she was "agitated" before the injection, and that after the injection she stopped banging her head and was able to sleep.  (*Id*.) There are no further allegations by Dawn Brown regarding her mental health care after April 26, 2001.

A court-ordered psychiatric examination was conducted on May 4, 2001 to determine Dawn Brown's competency pursuant to Article 730 of the Criminal Procedure Law.  (*Id*.)  As a result of the examination, on May 16, 2001, Dawn Brown was found to be an incapacitated person and was remanded to the custody of the State Commissioner of Mental Hygiene.  (*Id*.)  On or about May 16, 2001, Dawn Brown was discharged from the Jail and transferred to the Middletown Psychiatric Center.  (*Id*.)  Defendants contend that although on numerous occasions Dawn Brown refused medication and mental health care, defendants met their obligation to provide access to care and

continued to monitor her mental and physical condition, despite her refusal for such care.  (*Id*. at 75.)

### C.    <u>Croci</u>

Defendants contend that Croci received adequate mental health care and was seen by case workers and a psychiatrist on numerous occasions.  (*Id.* at 42.)  According to defendants, each time the medical staff or nurses reported Croci was acting strange or refusing his medications, he was referred to and seen by a psychiatrist.  (*Id*. at 43.)  Further, although Croci alleges that he requested his medications be changed, defendants note that there is no constitutional obligation to accommodate such a request.  (*Id*. at 44.)  Defendants also note that despite the fact that Croci met with his psychiatrist on numerous occasions, he made "no mention of side effects and certainly no mention of somnolence or a stupor."  (*Id*.)  In addition, defendants maintain that Croci's "extensive treatment record [in 1999] documents that Croci was not in a 'stupor' or 'state of somnolence'" as the complaint alleges, nor does the record indicate Croci complained to anyone about nausea or dizziness.  (*Id*. at 47.)

With respect to Croci's incarceration during 2001, his forensic clinic case was opened a day after he was admitted to the Jail, he saw a psychiatrist that same day and was diagnosed with "bi-polar disorder depressed" and medication was prescribed.  (*Id*. at 49.)  Croci refused all medications, so medical suggested counseling which he received.  (*Id*. at 50.)  In addition, defendants note that, despite Croci's allegations to the contrary, the records reveal that Croci was seen repeatedly by both clinicians and a psychiatrist during July and August 2001.  (*Id*. at 56.)

D.      **Grassfield**

Defendants maintain that Grassfield was provided with adequate mental health treatment and the fact that he attempted suicide does not create an issue of fact with respect to the constitutionality of the care provided to him.[9]  (*Id*.)  Grassfield was appropriately screened in booking by corrections and was referred to mental health as a result of his high score on the Jail's suicide screening.  (*Id*. at 25.)  He was then seen by a nurse, who also referred him to mental health.  On the day Grassfield entered the jail, he was seen by a licensed social worker in the forensic clinic and his mental health case was opened.  (*Id*.)  The social worker obtained "Grassfield's consent for services, completed a detailed intake assessment and also obtained Grassfield's consent to obtain information from providers of services on the outside in order to verify his medication and treatment history."  (*Id*. at 26.)  Defendants also note that "Grassfield acknowledges the propriety of the jail's policy of not permitting inmates to take their own medication and the need to obtain verification from previous providers."  (*Id.*)

The social worker referred Grassfield for a psychiatric consult and recommended he be "monitored more closely" in the mental health housing unit.  The records indicate that Grassfield saw a psychiatrist on January 14, 2002, three days after he was admitted to the Jail.  (*Id*.)  In addition, the medication administration record reveals that Grassfield began receiving his medication on January 16, which was five days after he was admitted and two days after he saw the psychiatrist.  (*Id*. at 27.)  Notably, during the period of time that Grassfield was not taking any medication, he took no action to harm himself, others or property, nor did he suffer any apparent ill effects.  In fact, during that

---

[9] Defendants note that "Grassfield made numerous suicide attempts before and after his incarceration while under psychiatric care and on psychotropic drugs."  (*Id*. at 27.)

time, Grassfield was on "close watch" which protected him until he was seen by the psychiatrist. (*Id.*)

Moreover, with respect to the alleged February 4th suicide attempt, which defendants contend plaintiff has since admitted was a "joke," Grassfield was seen immediately by a case worker in the mental unit and referred to a psychiatrist for evaluation. (*Id.* at 28.) Grassfield was then counseled by the psychiatrist and had his medication adjusted. (*Id*.) As a result of the February 10th suicide attempt, Grassfield was immediately seen by medical personnel at the Jail and then taken to Arden Hill Hospital where he was evaluated and examined. He was then sent to Middletown Psychiatric Center where he spent three days. (*Id.* at 29.) When Grassfield returned to the Jail, he was seen by the psychiatrist for a "suicide evaluation" and was counseled and medication was prescribed. (*Id*.) Each time Grassfield requested to see a doctor, he was seen, and he continuously met with his caseworker for counseling. (*Id*.) Furthermore, Grassfield "received a detailed discharge plan which . . . he felt was more than adequate." (*Id*. at 30.) Defendants maintain that Grassfield "clearly benefitted from procedures in place at the forensic clinic in that he participated in group and individual therapy and was given ready access to a psychiatrist." Defendants also maintain that their response to Grassfield's suicide attempts were appropriate, as was the discharge plan. (*Id*.) Thus, defendants contend that "the forensic clinic had in place all necessary policies and staff to care for his mental health needs." (*Id*. at 31.)

E.    **Kracht**

Defendants contend that Kracht's mental health case was opened the same day he was admitted to the Jail, and although Kracht alleges that it took nine days to get his medication, he was

on "close watch" during that period and he admits that "he took no action to harm himself or others." (*Id*. at 32.) Defendants contend that this is due, "presumably, at least in part to the beneficial effects of [the] intense level of supervision." (*Id*.) Defendants maintain that a review of Kracht's chart for the period in which he alleges that his constitutional rights were violated indicates that he was seen by his clinician/case worker on numerous occasions, consulted with clinic psychiatrists sixteen times and participated in group therapy about twenty times. In addition, defendants allege that while Kracht may have complained about his medication, these complaints were addressed by the clinic. (*Id*.)

Further, defendants note that Kracht was sentenced "more than fifteen times" and had been a patient of the clinic during his prior incarcerations, but challenges how he was treated during only this sentence. (*Id*. at 31.) Defendants maintain that during the period about which he complains, Kracht was treated "with the same or substantially similar medications" that were administered to him during his prior incarcerations. (*Id*. at 32.)

## F. __Bellotto__

Defendants maintain that Bellotto had a prior history of hospitalization for depression, about which the Jail was advised, and that Bellotto was depressed at the time of his admission. (*Id*. at 17.) Bellotto saw a psychiatrist during his incarceration who diagnosed him with depression and prescribed Paxil and supportive therapy. (*Id*.) Therefore, defendants contend that "[a]s far as the forensic clinic was concerned a depressed inmate was referred to it by medical, he consented to care, was screened by a clinician and seen by a psychiatrist whose medical judgment resulted in a Paxil prescription. The clinic received no complaints from the inmate, corrections or medical with respect

to adverse side effects, assuming there were any." (*Id*. at 18.) Additionally, defendants note that Bellotto suffered no ill effects from taking Paxil, and "[t]he allegation that it made him sleep a lot, even if true, is insufficient to satisfy the Eighth Amendment standard for deficient mental health care." (*Id*. at 19.)

### G. Jane Brown

Defendants maintain that Jane Brown's forensic clinic file was opened within three days of her admission and she was seen by a psychiatrist who diagnosed her with a "depressive disorder, NOS and polysubstance abuse." (*Id*. at 20.) She was then prescribed medication which was "standard" for her condition, and she "expressed no objection to the doctor with respect to these medications." (*Id*. at 21.) Further, with respect to Paxil, the medication administration record notes that she received it whenever she wanted it with the exception of three times and that she refused to take it twelve times. (*Id*. at 22.)

In addition, defendants note that Jane Brown "thrived during her short stay in jail" in that she completed her GED, read numerous books, attended special programs in the evening, participated fully in available activities and "there was nothing about her medication that made her ill or prevented her from taking advantage of these programs." (*Id.* at 21.) Further, when Jane Brown informed the forensic clinic that she sometimes missed her medication because of school, her prescription was changed to bedtime rather than the morning to accommodate her. (*Id*.) Moreover, she told the doctor during a routine check-up, three weeks after her initial visit, that she was "presently less depressed." (*Id*.) Additionally, defendants note that the one time Jane Brown submitted a request for mental health services, she was seen immediately by her caseworker who

then referred her to the psychiatrist. (*Id.*)

Lastly, with respect to the claim that Jane Brown was not provided any discharge planning, defendants maintain that she herself decided not to continue with the medication or go for follow-up care despite the fact that post-release treatment was discussed with her doctor prior to her release. (*Id.* at 23.) Thus, defendants maintain that Jane Brown "did well while incarcerated and can point to no ill effect from anything that occurred as a result of her treatment by the clinic" and that any withdrawal symptoms from the medications "was self-induced" because she "voluntarily avoided compliance with the forensic clinic's post-release treatment recommendation." (*Id.*)

## III.   Present Motion

In the present motion, defendants move to preclude the testimony of plaintiffs' expert and for summary judgment. In addition, defendants move for severance of plaintiffs' claims.

## DISCUSSION

## I.   Motion to Preclude Plaintiffs' Expert

Fed. R. Civ. P. 26 requires that parties disclose the identity of a witness who is retained or employed to provide expert testimony. Fed. R. Civ. P. 26(a)(2)(A). In particular, Rule 26 provides that the disclosure include a written report prepared and signed by the expert witness which

> shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

FED. R. CIV. P. 26(a)(2)(B). "[A report is deficient if it] fails to include any of the *underlying conclusions* on which the expert's ultimate opinions are based. Bald conclusions on the ultimate issues do not alone amount to a 'detailed and complete written report' of the expert's expected testimony. . . . [A report is also deficient if it] fail[s] to set forth 'a complete statement' of the 'basis and reasons' for [the] expert['s] opinions." *Giladi v. Strauch*, No. 94 Civ. 3976, 2001 WL 388052, at *4-5 (S.D.N.Y. Apr. 16, 2001) (citing Rule 26(a)(2)(B) Advisory Committee's Notes on 1993 amend.) (internal citations omitted); *see also Bristol-Myers Squibb Co. v. Rhône-Poulenc Porer, Inc.*, No. 95 Civ. 8833, 2000 WL 356412, at *1 (S.D.N.Y. Apr. 5, 2000) (recognizing that an expert's report should be "'detailed and complete . . . stating the testimony the witness is expected to present during direct examination, together with the reasons therefor'") (quoting Rule 26(a)(2)(B) Advisory Committee's Notes on 1993 amend., ¶ 2). Rule 26 further provides that "[i]n the absence of other directions from the court or stipulation by the parties, the disclosures shall be made at least 90 days before the trial date or the date the case is to be ready for trial." FED. R. CIV. P. 26(a)(2)(C).

Rule 37 authorizes courts to impose sanctions when a party does not comply with the Federal Rules of Civil Procedure pertaining to discovery. *See Point Prods. A.G. v. Sony Music Entm't, Inc.*, No. 93 Civ. 4001, 2004 WL 345551, at *9 (S.D.N.Y. Feb. 23, 2004). Rule 37 is self-executing and "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at trial . . . any witness or information not so disclosed." FED. R. CIV. P. 37(c)(1). The exclusion of undisclosed information is automatic and the non-disclosing party has the burden to demonstrate that the failure to disclose was substantially justified or that the failure was harmless. *See Middle Mkt. Fin. Corp. v. D'Orazio*, No. 96 Civ. 8138, 2002 WL 31108260, at *4 (S.D.N.Y. Sept. 23, 2002) ("The

'automatic sanction' for a violation of Rule 26(a) is preclusion."); *see also Giladi*, 2001 WL 388052, at *1, 3 ("[P]reclusion is appropriate unless there is 'substantial justification' or the failure to make disclosure is harmless."); *Potter v. Phillips*, No. 03 Civ. 4942, 2004 WL 3250122, at *2 (E.D.N.Y. Mar. 28, 2004). However, the imposition of sanctions under this rule is discretionary, and preclusion is not generally ordered. *See Semi-Tech Litig. LLC v. Bankers Trust Co.*, 219 F.R.D. 324, 325 (S.D.N.Y. 2004); *see also Babcock v. Rezak*, No. 96 Civ. 0394, 2002 WL 31654995, at *1 (W.D.N.Y. Nov. 6, 2002) (noting that the preclusion of expert testimony is "'a drastic remedy and should only be applied in those rare cases where the party's conduct represents bad faith and callous disregard of the Federal Rules of Civil Procedure'") (quotations omitted). The Second Circuit has stated that the following factors are relevant in the determination of whether preclusion is appropriate: "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Softel, Inc. v. Dragon Med. & Scientific Comm., Inc.*, 118 F.3d 955, 961 (2d Cir. 1997) (citing *Outley v. City of New York*, 837 F.2d 587, 590-91 (2d Cir. 1988)).

In the case at bar, defendants seek to preclude plaintiffs from offering the expert witness testimony of Dr. Patrice Harris and evidence related thereto. (Defs. Mem. Supp. Preclusion at 1.) Defendants maintain that plaintiffs' Rule 26(a)(2) disclosure concerning Dr. Harris is deficient on the ground that the report was neither detailed nor complete and was based only on a preliminary review. (*Id*. at 2, 3.) According to defendants, the report contains only conclusory statements by Dr. Harris without any basis for her conclusions. (*Id*. at 2.) For instance, defendants direct the Court's attention to the fact that Dr. Harris's report, with respect to four of the six plaintiffs, notes

"inappropriate use of punishment for inmates with mental illness" without providing any further explanation. (*Id.*) In addition, the report fails to identify what, if any cases, Dr. Harris has previously testified in the preceding four years, a requirement pursuant to FED. R. CIV. P. 26(a)(2)(B).[10] (Defs. Mem. Supp. Preclusion at 3.)

Plaintiffs respond to defendants' motion to preclude the testimony of Dr. Harris by noting that defendants never asked plaintiffs to supplement the report, nor did they raise any objections to the report, even though they have had it in their possession for over a year. (Pls. Mem. Opp. Preclusion at 2.) In addition, defendants never sought to take Dr. Harris's deposition. (*Id.*) Further, plaintiffs assert that "[a]lthough concise, Dr. Harris's report contains a complete statement of her opinions and bases therefor, while noting the materials she reviewed in forming her opinions." (*Id.*) In addition, plaintiffs correctly point out that Local Rule 37.2 provides that "[n]o motion under Rules 26 through 37 . . . shall be heard unless counsel for the moving party has first requested an informal conference with the court and such request has either been denied or the discovery dispute has not been resolved as a consequence of such a conference." (*Id.* at 5.) Here, defendants never raised any objection to plaintiffs' expert's report either to the Court or plaintiffs prior to the present motion. (*Id.*)

Consequently, while we agree with defendants that Dr. Harris's report is deficient and fails to comply fully with Rule 26, upon consideration of the factors outlined by the Second Circuit in *Softel*, we do not believe preclusion is the appropriate remedy. First, plaintiffs contend that Dr.

---

[10] Plaintiffs, however, in their response papers note that Dr. Harris has only testified in one case during the relevant time frame. (Pls. Mem. Opp. Preclusion at 3.) In addition, plaintiffs note that their expert should not be precluded on the basis of this minor omission, "particularly [because] defendants never sought to take her deposition." (*Id.*)

Harris's report does comply with Rule 26 and, to the extent that it does not, they were unaware because defendants never made any objections nor did they request that the report be supplemented. In addition, Dr. Harris's testimony is essential to plaintiffs' case, and while defendants may be prejudiced by the deficient report, they had over a year to object to the report; thus, any prejudice is a result of their tactical decision to wait until a few months before trial to seek preclusion. Furthermore, plaintiffs annexed a declaration by Dr. Harris to their opposition papers further detailing her conclusions with respect to the care provided to each plaintiff and her bases for those conclusions. We also note that plaintiffs are willing to make Dr. Harris available for deposition by defendants prior to trial if necessary. Accordingly, defendants' motion to preclude plaintiffs' expert witness is denied.

## II.     Motion for Summary Judgment

### A.     Summary Judgment Standard

Under FED. R. CIV. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-50 (1986). A fact is material only if, based on that fact, a reasonable jury could find in favor of the non-moving party. *Anderson*, 477 U.S. at 248. The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See Anderson*, 477 U.S. at 255. To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to

the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The court's role at this stage of the litigation is not to decide issues of material fact, but to discern

whether any exist. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir.

1994). _____

## B.     Individual CO Defendants

_____The CO defendants move for summary judgment with respect to plaintiffs Croci, Grassfield

and Dawn Brown, on the basis that they have failed to demonstrate that the individual COs used

excessive force against them in violation of their constitutional rights.  (CO Defs. Mem. Supp.

Summ. J. at 4-5.)

The Eighth Amendment, which applies to the states through the due process clause of the

Fourteenth Amendment, prohibits the infliction of "cruel and unusual punishment" including the

"unnecessary and wanton infliction of pain." *See Rhodes v. Chapman*, 452 U.S. 337, 344-45 (1981);

*Gregg v. Georgia*, 428 U.S. 153, 173 (1976). An Eighth Amendment claim of cruel and unusual

punishment consists of two components: (1) a subjective component which focuses on the

defendant's motive for his conduct; and (2) an objective component which focuses on the conduct's

effect. *See Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000).  The subjective component "requires a

showing that the defendant 'had the necessary level of culpability, shown by actions characterized

by 'wantonness'' in light of the particular circumstances surrounding the challenged conduct." *Id.*

at 21 (quoting  *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999) (quoting *Wilson v. Seiter*, 501

U.S. 294, 299 (1991))).  In excessive force cases, "wanton" conduct involves force that is applied

"maliciously and sadistically to cause harm" as opposed to force that is "applied in a good-faith

effort to maintain or restore discipline." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *see also*

*Blyden,* 186 F.3d at 262-63. "To determine whether defendants acted maliciously or wantonly, a

court must examine several factors including: the extent of the injury and the mental state of the

defendant, as well as 'the need for the application of force; the correlation between that need and the

amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the

defendants to temper the severity of a forceful response.'" *Scott v. Coughlin*, 344 F.3d 282, 291 (2d

Cir. 2003) (quoting *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (citations omitted)). The

objective component of an Eighth Amendment violation claim requires that the violation be

"'sufficiently serious' by objective standards." *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999).

"The objective component . . . is . . . contextual and responsive to 'contemporary standards of

decency.' . . . When prison officials maliciously and sadistically use force to cause harm,

contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 8-9. A showing of

extreme injury is not required to bring an excessive force claim against prison officials; however,

"'*de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the

conscience of mankind'" are not actionable as a violation of the Eighth Amendment. *Sims*, 230 F.3d

at 21-22 (quoting *Hudson*, 503 U.S. at 10).

With the above principles in mind, we will now examine the excessive force claims of the

plaintiffs as to which the CO defendants seek summary judgment.

### 1.     Croci's Excessive Force Claims

Croci alleges that on June 16, 2001 he was so severely beaten by COs Daniel Figueroa,

Michael Andricut and Edward Craven during a manic/psychotic episode that he required treatment

at the Arden Hill Hospital Emergency room.  (CO Defs. Mem. Supp. Summ. J. at 5.)  Defendants maintain that summary judgment is warranted on this claim because neither Figueroa nor Andricut were working on June 16, 2001.  (*Id*.)  In support of this claim, defendants offer affidavits from Andricut and Figueroa and corresponding employment records which indicate that both officers were not working on June 16, 2001.  (*Id*.)  In addition, Croci has stipulated to discontinue with prejudice any claims he may have had against the only remaining individually named CO involved in this claim, Craven, who is deceased.  (Burke Affm., Ex. D.)

A plaintiff may recover under § 1983 against any individual acting under the color of state law who has caused him or her to be deprived "of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983; see *also Am. Mfrs. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999) ("To state a claim for relief in an action brought under § 1983, [plaintiff] must established that [he was] deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law.").  However, absent personal involvement, an individual defendant cannot be liable under § 1983.  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).  The Second Circuit has made clear that an individual defendant is deemed to be personally involved in a section 1983 violation if:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or  (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Madison v. Mazzuca*, No. 02 Civ. 10299, 2004 WL 3037730, at *6 (S.D.N.Y. Dec. 30, 2004) (citing

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Wright*, 21 F.3d at 501)).

Consequently, because Croci has dismissed his claim against officer Craven and has not provided any evidence of individual involvement on the part of Figueroa or Andricut, summary judgment is warranted with respect to Croci's excessive force and failure to intervene claims.

### 2.      Grassfield's Excessive Force Claims

Grassfield alleges that after a suicide attempt while incarcerated at the Jail, he was subjected to excessive force by COs at the Jail.  According to Grassfield,

> officers opened his cell and a sergeant (DiChairo) grabbed the sheet which was still wrapped around Grassfield's neck and "yanked" him out of the cell.  Officers Pastor and Sotelo grabbed Grassfield's arms, threw them behind his back and handcuffed him.  Grassfield then heard someone say, "get him the fuck out of here."  Pastor and Sotelo picked up Grassfield (with his feet "dangling behind" him) and these officers "slammed, slammed hard as they possibly could into the door."  While "purposely" slamming Grassfield's head into the door, Pastor called him a "stupid mother fucker."

(Pls. Mem. Opp. Summ. J. at 52 (quoting Grassfield Dep. at 145-46, 149-50).)  Grassfield alleges that he "was slammed into doors and walls at least three separate times and he suffered severe pain in his shoulders which lasted between three and five days."  (*Id*. at 52-53 (quoting Grassfield Dep. at 158, 163).)

Defendants, however, maintain that with regard to this incident, Grassfield had attempted to hang himself from a sheet attached to the sprinkler system, but because of his size,[11] the sprinkler head broke off and water sprayed out filling Grassfield's cell.  (*Id*.)  Grassfield testified at his deposition that it seemed like "8,000 gallons" of water were filling his cell.  (Grassfield Dep. at 142-

---

[11] Grassfield is 6' 8" and 230 pounds.  (CO Defs. Mem. Supp. Summ. J. at 8.)

43.) Consequently, defendants contend that when Grassfield alleges he was slammed into doors and walls as the COs transported him to the mental health unit, what actually transpired was that Sotelo and Pastor "were slipping in the water and, as [a] result of their slipping, Grassfield was thrown against the wall." (CO Defs. Mem. Supp. Summ. J. at 8.) In addition, defendants maintain that Russell and DiChiaro were not involved in transporting Grassfield to the mental health unit; and therefore cannot be liable for the alleged excessive force because they were not personally involved.[12]

### a. Adequacy of Grassfield's Excessive Force Claim

Grassfield must demonstrate that both the subjective and objective components of an excessive force claim under the Eighth Amendment are met. As discussed above, the objective component "'focuses on the harm done,'" and the "'amount of harm that must be shown depends on the nature of the claim.'" *Sales v. Barizone*, No. 03 Civ. 6691, 2004 WL 2781752, at *11 (S.D.N.Y. Dec. 2, 2004) (quoting *Sims*, 230 F.3d at 21). A court may consider "'the need for

---

[12] It should be noted that Grassfield does not object to the dismissal of CO defendant Russell from this action. (Pls. Mem. Opp. Summ. J. at 53 n.5.) Accordingly, all claims against Russell are dismissed with prejudice. With respect to Grassfield's claims against DiChiaro, plaintiffs have not provided sufficient evidence to maintain an excessive force claim against DiChiaro. Plaintiffs have offered no evidence as to DiChiaro's personal involvement in the alleged constitutional violations other than the conclusory statement that "DiChiaro assaulted him maliciously" and that DiChiaro "yanked" Grassfield out of the cell after Grassfield tried to hang himself. (Pls. Mem. Opp. Summ. J. at 56; Pls. Rule 56.1 Stmt. ¶ 88.) It is uncontested that COs Pastor and Sotelo were the officers who transported Grassfield to the mental health unit when the alleged excessive force occurred, although plaintiffs do allege that DiChiaro accompanied Pastor and Sotelo as they transported Grassfield to the mental health unit. (CO Defs. Reply Mem. Supp. Summ. J. at 9; Pls. Rule 56.1 Stmt. ¶ 93.) Consequently, all claims against DiChiaro are dismissed without prejudice because plaintiffs have not provided sufficient evidence with respect to DiChiaro's personal involvement in the alleged excessive force which occurred as Grassfield was being transported from his cell to the mental health unit.

application of force,'" "'the relationship between the need and the amount of force used, the threat reasonably perceived'" by the guards as well as "'any efforts made to temper the severity of a forceful response.'" *Sales*, 2004 WL 2781752, at *11 (quoting *Hudson*, 503 U.S. at 7).  In addition, the subjective component requires that Grassfield demonstrate that the CO defendants acted with a "'malicious or sadistic' state of mind since 'decision[s] to use force [are] generally made in haste, under pressure, and frequently without the luxury of a second chance.'"  *Sales*, 2004 WL 2781752, at *11 (quoting *Trammell v. Keane*, 338 F.3d 155, 162 (2d Cir. 2003)).  "Excessive force does not, in and of itself, establish malice or wantonness for Eighth Amendment purposes;" thus, Grassfield must demonstrate that Pastor and Sotelo acted with the necessary level of culpability.  *Romano*, 998 F.2d at 106.

Grassfield alleges that he suffered severe pain in his shoulder which lasted three to five days. While this does not appear to be a serious injury, it is not *de minimis* as a matter of law.  *See, e.g., Evering v. Rielly*, No. 98 Civ. 6718, 2001 WL 1150318, at *6 (S.D.N.Y. Sept. 28, 2001) (finding that injuries such as bruises, knot in back, soreness and redness in vaginal area and knife wound on right arm were not *de minimis* as a matter of law); *Griffin*, 193 F.3d at 92 (finding a bruised shin and swelling over left knee were not *de minimis* as a matter of law); *Miner v. Ramsey*, No. 99 Civ. 11661, 2001 WL 540746, at *3 (S.D.N.Y. May 22, 2001) (denying summary judgment where plaintiff's injuries included bruised and swollen wrist).  It should also be noted that at the time of the alleged incident, Grassfield was handcuffed.  If the incident occurred as plaintiff described it, it clearly violates "contemporary standards of decency;" thus, "[w]hether [Grassfield's] injuries were sufficiently serious as to satisfy the objective element of [his] excessive force claims is for the jury to decide."  *Evering*, 2001 WL 1150318, at *6.  Accordingly, we conclude that Grassfield has

established that the objective component of his excessive force claims has been met to the extent of surviving summary judgment.

With respect to the subjective component, Grassfield maintains that the CO defendants' "wanton" state of mind is demonstrated by the COs' comments such as "get him the fuck out of here" and calling Grassfield "a stupid motherfucker" while "purposely" slamming his head into the door. (Pls. Mem. Opp. Summ. J. at 52-53.) In addition, as mentioned above, Grassfield was handcuffed at the time of the alleged incident and therefore was not a threat to the COs' safety or to the maintenance of order at the Jail. Although Pastor and Sotelo assert that they were slipping on the water and were not purposely trying to have Grassfield's body hit the walls, this is a motion for summary judgment and we must consider all facts in a light most favorable to the non-moving party. Consequently, there exists a genuine issue of fact concerning the amount of force used by the COs and the intent with which it was applied, e.g., whether Pastor and Sotelo's use of force was malicious. Courts in this district decline to dismiss complaints alleging excessive force even at the summary judgment stage if "conflicts exist in the record regarding the degree and justification of force." *Evering*, 2001 WL 1150318, at *7 (collecting cases). Accordingly, the CO defendants' motion for summary judgment is denied with respect to Grassfield's excessive force claim.[13] However, we must now determine whether the defendants are shielded from liability under the doctrine of qualified immunity.

### b.     Qualified Immunity

---

[13] Although the CO defendants maintain that Grassfield cannot establish sufficient injury under the Prisoner Litigation Reform Act (the "PLRA") and therefore should be precluded from introducing evidence of emotional or psychological injuries, Grassfield has not alleged any emotional or psychological injuries as a result of the alleged excessive force. (CO Defs. Mem. Supp. Summ. J. at 13.) Accordingly, the Court need not consider these arguments.

As a general rule, law enforcement officers are entitled to qualified immunity if: (1) their conduct does not violate clearly established constitutional rights; or (2) it was objectively reasonable for them to believe that their acts did not violate those rights. *Oliveira v. Mayer*, 23 F.3d 642, 648 (2d Cir. 1994), *cert. denied*, 513 U.S. 1076 (1995). It is indisputable that freedom from the use of excessive force is a clearly established constitutional right. The issue is whether it was objectively reasonable for the CO defendants to believe that their acts did not violate Grassfield's right to be free from the use of excessive force. Although this inquiry requires a focus on the particular facts of the case, the Second Circuit has held that a defendant is entitled to summary judgment on qualified immunity grounds only when

> "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for defendant[]" to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

*Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987) (quoting *Halperin v. Kissinger*, 807 F.2d 180, 189 (D.C. Cir. 1986) (Scalia, J., sitting by designation)).

In the case at bar, there is an issue of fact surrounding the circumstances of the alleged excessive force. Grassfield maintains that he was purposely slammed into walls by the COs on the way to the mental health unit, while defendants maintain that if Grassfield's body did bump into any walls, it was an accident because the COs were merely slipping on water that was on the floor as a result of the broken sprinkler. These factual issues preclude summary judgment on the defense of qualified immunity.

### 3. Dawn Brown's Excessive Force and Conditions of Confinement Claims

_____Dawn Brown asserts three specific incidents of constitutional violations by eleven individual CO defendants. (Pls. Mem. Opp. Summ. J. at 49.) Two of the claims involve excessive force and failure to intervene allegations and the third claim involves allegations relating to the conditions of confinement.

### a.    Excessive Force

The first alleged incident occurred on April 12, 2001, when, according to the Complaint, she was assaulted by COs Serrano, Dominick, Curreri and Weissinger.[14] (Pls. Mem. Opp. Summ. J. at 49.) Dawn Brown alleges that she was beaten, handcuffed, shackled and had her head placed in a helmet by CO defendants Serrano, Dominick and Curreri.[15] (CO Defs. Mem. Supp. Summ. J. at 13.) Dawn Brown alleges that Dominick and Serrano entered her cell and forcibly restrained and handcuffed her after "psychotic" behavior and her refusal to calm down after she had demanded to see a doctor. (Pls. Mem. Opp. Summ. J. at 49.) Dawn Brown further alleges that while handcuffed and shackled, she was first taken to the mental health offices where she was seen by a staff social worker and was then taken by Dominick, Curreri and Serrano to the "bullpen" where she was forced into a restraint chair and helmeted for several hours. (_Id_.) According to plaintiffs, "[t]he nursing notes for the evening of April 12, 2001 document 'bruising' on Brown's arm which was sustained earlier in the day." (_Id_. at 49-50.)

The second incident alleged by Dawn Brown occurred on April 26, 2001, and she alleges that

---

[14] Although in the opposition papers plaintiffs refer to an alleged unprovoked assault against Dawn Brown by CO defendants Sergi and Jones, there is no mention of this incident in the Complaint, thus the Court will not consider that claim.

[15] Although Dawn Brown alleges excessive force claims against CO Weissinger in the Complaint, the parties have since stipulated to the dismissal of Weissinger from this action with prejudice. (Burke Affm., Ex. D.)

she was placed in a restraint chair, beaten, handcuffed, shackled and helmeted by CO defendants Zappolo, Ferreri, Conklin and Pelton.[16] (CO Defs. Mem. Supp. Summ. J. at 13-14.) Dawn Brown alleges that she was beaten by officers Conklin and Pelton as she was forced into the restraint chair and then helmeted while in the restraint chair. (Pls. Mem. Opp. Summ. J. at 50.) Plaintiffs further allege that the correction officers "do not have training to deal with mentally challenged inmates." (*Id*.)

Defendants assert that Dawn Brown's testimony reveals that she recalls only one incident of being beaten and placed in the restraint chair, which was the incident on April 26, 2001 involving Sergeant Conklin. (Dawn Brown Dep. at 91.) As a result, defendants contend that there is no evidence of any kind to support the April 12, 2001 excessive force claim and that the claims relating to this alleged incident involving officers Dominick, Serrano and Curreri should therefore be dismissed. (CO Defs. Mem. Supp. Summ. J. at 19.) We agree, and the claims by Dawn Brown against officers Dominick, Serrano and Curreri are hereby dismissed.[17]

With respect to the April 26, 2001 claim, defendants maintain that no excessive force was used against Dawn Brown. According to defendants, Ferreri was making rounds with a nurse who was administering medications when Dawn Brown threw urine and feces from her cell. (*Id*. at 18.)

---

[16] Plaintiffs do not object to the dismissal of defendants Zappolo and Ferreri from this action because Zappolo and Ferreri were not personally involved in the alleged constitutional violations. (Pls. Mem. Opp. Summ. J. at 51 n.4.) Accordingly, all of the claims against Zappolo and Ferreri are dismissed with prejudice.

[17] Although plaintiffs maintain that the nursing notes for the evening of April 12, 2001 document "bruising" on Dawn Brown's arm, this is not enough to sustain a claim of excessive force, especially in a case like here where the plaintiff does not even recall the incident. Furthermore, the declaration of Jane Brown offers little evidentiary support for this claim. She does not mention specific dates or specific officers; thus, her testimony is not sufficient to create a genuine issue of fact.

Ferreri then notified Sergeant Conklin about the situation. (*Id*.) Conklin's report indicates that "he ordered that Officer Pelton place hand restraints on inmate Brown and transport her to the 332 bullpen where Lt. Fredericks ordered that she be placed in a restraint chair for her own safety until she was seen by mental health." (*Id*.) Defendants maintain that at no time was Ferreri involved in Dawn Brown's removal or transport to the mental health unit. (*Id*.) Defendants also note that Dawn Brown was moved from her cell so that her cell could be cleaned by other inmates. (*Id*.) In addition, defendants allege that Dawn Brown was seen by the mental health unit, given an injection by the medical staff and returned to her cell in just over an hour. (*Id.*)

Defendants maintain that Dawn Brown has not testified that she was injured when she was removed from her cell and placed in the restraint chair and further note that her placement in the restraint chair was upon the orders of Lieutenant Fredericks for Dawn Brown's own safety. (*Id.*) Dawn Brown does not appear to allege any injuries as a result of the April 26, 2001 incident. Essentially, Dawn Brown's excessive force claims rests on the fact that the CO defendants placed her in a restraint chair after she threw feces and urine from her jail cell and was acting out.

In support of Dawn Brown's excessive force claims, plaintiffs offer the Officer Reports of Conklin and Ferreri relating to this incident, Use of Force Reports compiled by defendants dated 4/26/01, CMS nursing progress notes for Dawn Brown dated 4/26/01, testimony from Dawn Brown's deposition and a declaration from another inmate, Jane Brown.[18] The evidence presented

_____

[18] The declaration of Jane Brown relied on by plaintiffs states that "On at least four occasions, corrections officers and a sergeant came to Dawn's cell, beat her, restrained her, hog tied her, and carried her out of the dorm. An hour or two later, Dawn would be returned to the dorm, asleep for the next 12 hours. She appeared to be drugged since she was carried, asleep, into her cell. The corrections officers told[,] then bragged that Dawn was taken to the restraint chair." (Jane Brown Decl. ¶ 13.)

creates an issue of fact as to whether excessive force was used against Dawn Brown during the April 26, 2001 incident. The central question in an excessive force claim is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 6. Based on the record it is not absolutely clear that the force used by the CO defendants was reasonable and appropriate under the circumstances. Consequently, summary judgment with respect to Dawn Brown's April 26, 2001 excessive force claim is inappropriate. In addition, the issues of fact that preclude summary judgment with respect to this claim, preclude application of the doctrine of qualified immunity at the summary judgment stage.

### b. Conditions of Confinement

The Supreme Court held that "[t]he Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes*, 452 U.S. at 349). Consequently, the Eighth Amendment prohibition against cruel and unusual punishment requires that prison officials provide "humane conditions of confinement" including "adequate food, clothing, shelter and medical care." *Id*. To prevail on a claim that the conditions of confinement constitute cruel and unusual punishment, a plaintiff must demonstrate that the conditions of confinement fell below the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347. The prisoner "must show 'extreme deprivations,' '[b]ecause routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Sims*, 230 F.3d at 21 (quoting *Hudson*, 503 U.S. at 9 (quoting *Rhodes*, 452 U.S. at 347)); *see also Blyden*, 186 F.3d at 263 ("Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement'

claim."). In addition, a plaintiff must also show that the prison officials acted with "a sufficiently culpable state of mind," which, in the context of conditions of confinement claims, requires a showing of "deliberate indifference." *Luney v. Brureton*, No. 04 Civ. 2438, 2005 WL 121720, at *5 (S.D.N.Y. Jan. 21, 2005) (citing *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (citations omitted) ("*Hathaway II*"); *Wilson*, 501 U.S. at 298).

Dawn Brown alleges that she was confined to medical "keeplock" isolation and was deprived of water for almost one month which resulted in the swelling of her feet and ankles.[19] (Pls. Mem. Opp. Summ. J. at 51.) She maintains that officers Sergi, Kelly and Jones were responsible for shutting off her water. (CO Defs. Mem. Supp. Summ. J. at 14.) In addition, Dawn Brown alleges that she was denied sanitary food and basic hygiene items such as toilet paper, toothbrush and sanitary napkins. (Pls. Mem. Opp. Summ. J. at 51-52; Complt. ¶ 82; CO Defs. Mem. Supp. Summ. J. at 14.) In support of these allegations, plaintiffs offer the testimony of Dawn Brown and Jane Brown and medical records which verify the swollen feet and ankles. (Pls. Mem. Opp. Summ. J. at 51-52.) Jane Brown attested that Dawn Brown "begged and pleaded to her jailers to give her some water, 'all to no avail,'" and also that she "observed Dawn Brown in her cell with 'blood all over legs' because she was not provided with sanitary napkins." (*Id*. at 52 (quoting Jane Brown Decl. ¶ 4).) Plaintiffs maintain that these deprivations violated basic standards of decency and subjected Dawn Brown to cruel and unusual punishment in violation of the Eighth Amendment. (*Id*.)

Defendants, however, maintain that none of the named CO defendants shut off the water in

---

[19] We note that in the opposition papers, plaintiffs assert that Dawn Brown was deprived of water for almost a month, however, in the Complaint she alleges that "she lacked any drinking water for several days." (Pls. Mem. Opp. Summ. J. at 51; Complt. ¶ 82.) This is a significant discrepancy which the Court will take into account accordingly.

Dawn Brown's cell and, at the very least, COs Jones and Sergi should be dismissed from the denial of water claim because Dawn Brown testified at her deposition that officer Kelly shut off her water. (CO Defs. Mem. Supp. Summ. J. at 14-15.) In addition, defendants contend that the claim that Kelly shut off the water is not supported and, even if it were, it does not rise to the level of a constitutional violation. (*Id.*) Defendants further assert that Dawn Brown was never deprived of sanitary food to the extent of constituting a constitutional violation and note that the only allegation Dawn Brown offers to support this claim involved one incident where her food was served to her on a napkin through the food slot rather than on a tray. (*Id.* at 16.) Defendants maintain that although "having your food served to you on one occasion on a napkin or paper towel . . . may be unpleasant [it] does not amount to a constitutional deprivation." (*Id.* at 17.)

_____Eighth Amendment case law indicates that "prisoners are entitled to 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.'" *Luney*, 2005 WL 121720, at *5 (quoting *Robles v. Coughlin*, 725 F.2d 12, 14 (2d Cir. 1983) (per curiam) (citations omitted)). It is clear that food being served on a napkin or paper towel on one occasion did not "present an immediate danger to the health and well being" of Dawn Brown, and she has not offered any other allegations or evidence in support of her claim that she was denied sanitary food. Thus, we agree with defendants that Dawn Brown's denial of sanitary food claim does not rise to the level of a constitutional deprivation, and grant summary judgment on that claim. In addition, because plaintiffs fail to address defendants' contentions regarding the alleged denial of sanitary food, Dawn Brown's claim alleging that she was denied sanitary food by officers Sergi, Kelly and Jones is dismissed. *See, e.g., Singleton v. City of Newburgh*, 1 F. Supp. 2d 306, 312 (S.D.N.Y. 1998) (Conner, J.) (deeming

plaintiff's claim "abandoned" and granting defendants' summary judgment where claim was alleged in the complaint but "not raised elsewhere in the record"); *cf. Anti-Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 907 (S.D.N.Y. 1997) ("[T]he failure to provide argument on a point at issue constitutes abandonment of the issue."), *aff'd*, 130 F.3d 1101 (2d Cir. 1997).

_____With respect to Dawn Brown's claim that she was denied water, Dawn Brown testified that it was officer Kelly who shut off her water. (Dawn Brown Dep. at 218.) However, when questioned a second time about who shut off her water, Dawn Brown responded "I can't say exactly. I didn't see who did it so it's hard to tell you." (CO Defs. Mem. Supp. Summ. J. at 14 (quoting Dawn Brown Dep. at 223).) Jones, Kelly and Sergi all testified that they did not shut off Dawn Brown's water and that the maintenance department shuts off water, which can only be done on the order of a Sergeant or a higher-ranking officer. (*Id.*) It appears likely that Dawn Brown's water was controlled by a valve outside her cell which she could not see from inside the cell and that she would have no way of knowing who shut off her water. But this should not deprive her of a claim against those to whom she complained about its being shut off and became complicit in the action by doing nothing about it.

In addition, defendants assert that even if Dawn Brown had been deprived of water, it did not rise to the level of a constitutional deprivation. Defendants point out that Dawn Brown testified that she was provided with fluids with every one of her meals. (*Id.* (citing Dawn Brown Dep. at 201-02, 220-22).) In *Reid v. Artus*, the court recognized that the denial of running water in an inmate's cell was not a violation of the Eighth Amendment where the inmate was not deliberately denied necessary liquids. 984 F. Supp. 191, 193 (S.D.N.Y. 1998) (citing *Johnson v. Comm'r of Corr. Servs.,* 699 F. Supp. 1071 (S.D.N.Y. 1988)); *see also Beckford v. Portuondo*, 151 F. Supp. 2d 204,

211 (N.D.N.Y. 2001) (noting that "[n]owhere has it been held that prisoners are entitled to complete unfettered access to water or showers"). However, in the case at bar, Dawn Brown's testimony, as well as the medical records indicating that she had swollen feet and ankles, which plaintiffs contend was the result of water deprivation, creates an issue of fact with respect to whether she was deliberately deprived of water despite her complaints of resulting injury to her health, which could be a clear violation of the Eighth Amendment. Accordingly, that claim survives summary judgment.

Lastly, with respect to Dawn Brown's claim that she was denied basic hygiene products such as toilet paper, toothbrush and sanitary napkins, defendants have not offered sufficient evidence to the contrary. "The failure to regularly provide prisoners with . . . toilet articles including soap, razors, combs, toothpaste, toilet paper, access to a mirror and sanitary napkins for female prisoners constitutes a denial of personal hygiene and sanitary living conditions." *Dawson v. Kendrick*, 527 F. Supp. 1252, 1288-89 (D.C.W. Va. 1981) (citing *Newman v. Alabama*, 559 F.2d 283, 288 (5th Cir. 1977), *remanded with instructions sub nom.*, *Alabama v. Pugh*, 438 U.S. 781, *cert. denied*, 438 U.S. 915 (1978); *McCray v. Burrell*, 516 F.2d 357, 368 (4th Cir. 1975), *cert. dismissed*, 426 U.S. 471 (1976); *Bolding v. Holshouser*, 575 F.2d 461, 464-65 (4th Cir. 1978), *cert. denied*, 439 U.S. 837 (1978); *Ahrens v. Thomas*, 434 F. Supp. 873, 890-91 (W.D. Mo. 1977), *modified*, 570 F.2d 286 (8th Cir. 1978)). Dawn Brown alleges that these deprivations occurred as a result of the inaction by COs Jones and Kelly. Dawn Brown stated on two occasions that Kelly refused to provide her with a sanitary napkin, but could not say whether Jones ever refused to give her a sanitary napkin. (CO Defs. Reply Mem. Supp. Summ. J. at 8.) In addition, Jane Brown attested to the fact that she observed Dawn Brown in her cell with "blood all over her legs" because she was not provided with sanitary napkins. (Jane Brown Decl. ¶ 4.) Accordingly, summary judgment is not appropriate with

respect to Dawn Brown's claim against defendant Kelly alleging deprivation of basic hygiene products; however, the claim is dismissed with respect to defendant Jones because there is no evidence to support the claim that Jones was personally involved in the alleged deprivation.

      **4.    Failure to Intervene**

      Croci's failure to intervene claims premised on his excessive force claim are dismissed. Croci has failed to establish any constitutional violations based on excessive force. The case law in the Second Circuit is clear: "law enforcement officers' affirmative duty to intervene exists only where a person's constitutional rights have been violated." *Stefanopoulous v. City of New York*, No. 01 Civ. 0771, 2005 WL 525552, at *4 (E.D.N.Y. Feb. 28, 2005) (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *see also Foy v. City of New York*, No. 03 Civ. 7318, 2004 WL 2033074, at *3 (S.D.N.Y. Sept. 10, 2004) ("[T]here can be no failure to intervene where there was no constitutional violation."). Accordingly, Croci's claims based on a failure to intervene with respect to his excessive force claims are dismissed.

However, Dawn Brown's failure to intervene claims based on her excessive force and conditions of confinement claims survive summary judgment because this Court found those claims to be actionable. In addition, the failure to intervene claims brought by Atkins and Grassfield premised on alleged excessive force survive summary judgment as well. However, because plaintiffs' failure to intervene claims are not alleged with sufficient particularity, i.e., they fail to name which defendants are allegedly liable for failure to intervene with respect to each particular incident, all failure to intervene claims must be dismissed. However, plaintiffs may amend the Complaint within ten days of this Opinion and Order to replead the failure to intervene claims with

respect to the alleged constitutional deprivations that survived summary judgment and name the proper defendants with respect to each incident.

### C. County Defendants

Plaintiffs allege that the mental health treatment they received at the Jail was "deliberately indifferent" to their serious medical needs and that Ashman, the Commissioner of Mental Health, had direct knowledge of the systematic inadequacies of the Jail's mental health clinic, but failed to correct those deficiencies. (Pls. Mem. Opp. Summ. J. at 1.) They further allege that the County, through the deficient customs and policies of its forensic clinic, is liable for the injuries. (*Id*.) The County defendants, however, maintain that each plaintiffs' mental health care exceeded the standard required under the Eighth and Fourteenth Amendments; thus, plaintiffs' claims against the County defendants should be dismissed. (County Defs. Mem. Supp. Summ. J. at 75.) In addition, the County defendants contend that even if the Court were to find that plaintiffs' constitutional rights were violated, neither Ashman nor the County is liable because Ashman had no personal involvement in the plaintiffs' treatment at the forensic clinic and he is entitled to qualified immunity, and plaintiffs cannot connect any alleged constitutional deprivation to an official policy, which is necessary to find liability on the part of the County. (County Defs. Mem. Supp. Summ. J. at 79, 85, 87.)

### 1. Whether Plaintiffs' Constitutional Rights Were Violated

Plaintiffs assert Eighth Amendment claims for cruel and unusual punishment based on

alleged indifference to serious medical needs.[20]  It is well-settled that inadequate medical treatment

for a prisoner can constitute cruel and unusual punishment.  *See Estelle v. Gamble*, 429 U.S. 97, 103

(1976).  In the Second Circuit, it is equally clear that psychiatric or mental health care "is an integral

part of medical care" and falls under the rule laid out in *Estelle* which requires that such care be

provided to prisoners.  *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989); *see also Young v.

Coughlin*, No. 93 Civ. 0262, 1998 WL 32518, at *4 (S.D.N.Y. Jan. 29, 1998) ("The guarantee of the

minimal standards of medical care to prisoners extends to treatment of psychological or psychiatric

disorders.") (collecting cases).

        To successfully bring a claim under § 1983 for a violation of the Eight Amendment for

inadequate medical treatment, a plaintiff must establish that defendants were "deliberately indifferent

to his serious medical needs."  *See McCoy v. Goord*, 255 F. Supp. 2d 233, 258 (S.D.N.Y. 2003)

(citing *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)).  The standard of deliberate

indifference consists of both objective and subjective elements.  *Id.*  First, the alleged deprivation

of care must be sufficiently serious in objective terms such that the plaintiff's condition presents a

"'condition of urgency, one that may produce death, degeneration, or extreme pain.'"  *Id.* (quoting

*Hathaway*, 37 F.3d at 66 (citations omitted)).  However, "the Supreme Court extended Eighth

---

        [20] We note that some of the plaintiffs were pre-trial detainees while others were convicted
prisoners.  However, the Second Circuit has applied the analysis of the Eighth Amendment
deliberate indifference test to claims brought by pre-trial detainees under the Due Process Clause
of the Fourteenth Amendment.  *See Santiago v. City of New York*, No. 98 Civ. 6543, 2000 WL
1532950, at *4 (S.D.N.Y. Oct. 17, 2000) (citing *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir.
2000)).  In *Cuoco*, the Second Circuit recognized that a claim that arises under the Due Process
Clause of either the Fifth Amendment or the Fourteenth Amendment requires application of the
standard developed under the Eighth Amendment.  *Santiago*, 2000 WL 1532950, at *4 n.4.
Accordingly, all of the plaintiffs' claims will be analyzed under the deliberate indifference
standard.

Amendment protection beyond current health problems to those that are 'sufficiently imminent' and 'sure or very likely to cause serious illness and needless suffering in the next week or month or year.'" *Young*, 1998 WL 32518, at *4 (quoting *Helling v. McKinney*, 509 U.S. 25, 33 (1993)). The determination of "[w]hether a medical condition is sufficiently serious" requires an objective assessment. *Id.*

On the other hand, whether a defendant acted in a deliberately indifferent manner, with respect to a plaintiff's serious condition, is to be judged subjectively. *Id*. This element requires the plaintiff to establish that "the defendants were aware of plaintiff's serious medical needs and consciously disregarded a substantial risk of serious harm." *McCoy*, 255 F. Supp. 2d at 258-59 (citing *Hathaway*, 37 F.3d at 66). A finding of deliberate indifference cannot be made "'unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that substantial risk of serious harm exists, and he must also draw the inference.'" *Young*, 1998 WL 32518, at *4 (quoting *Farmer*, 511 U.S. at 837); *see also Amaker v. Coombe*, No. 96 Civ. 1622, 2002 WL 523388, at *5 (S.D.N.Y. Mar. 29, 2002) (noting that "[s]ubjectively, the charged official must have a mental state 'equivalent to criminal recklessness'"). "Mere negligence, medical malpractice, or differences of opinion regarding medical treatment do not give rise to an Eighth Amendment violation." *McCoy*, 255 F. Supp. 2d at 259 (citations omitted); *Young*, 1998 WL 32518, at *4 (citing *Estelle*, 429 U.S. at 106-07). However, medical malpractice in some cases may rise to the level of deliberate indifference where it "'involves culpable recklessness, i.e., an act or failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'''" *Young*, 1998 WL 32518, at *4 (quoting *Hathaway II*, 99 F.3d at 553 (citation omitted)).

In the case at bar, the County defendants contend that each plaintiffs' mental health care exceeded the standard of care required under the Eighth and Fourteenth Amendments and that the claims against the County defendants should therefore be dismissed.  (County Defs. Mem. Supp. Summ. J. at 75-76.)  It is not in dispute that plaintiffs exhibited mental health deficiencies that were serious in nature.  However, the County defendants contend that plaintiffs were provided with adequate medical care and that there was no constitutional deprivation, and, even if the Court were to find that plaintiffs were subjected to a constitutional deprivation, plaintiffs are unable to demonstrate that neither Ashman, nor any other employee at the Jail, exhibited a "sufficiently culpable state of mind."  (*Id*. at 77.)

Plaintiffs allege that they were subjected to the following mistreatment while incarcerated at the Jail: "over-medication with psychotropic drugs; denial of timely psychiatric evaluations; denial of emergency psychiatric care; denial of timely prescription drug administration; denial of adequate staffing of observation holding cells; denial of adequate therapeutic psychiatric care; and, denial of discharge planning and treatment plans."  (Complt. ¶ 3.)  In support of their assertion that they received substandard medical care, plaintiffs offer the expert testimony of Dr. Harris, who after review of plaintiffs' medical and mental health records[21] and the *Merriweather* Consent Judgment,[22]

---

[21] Dr. Harris reviewed the mental health records of Belloto and Grassfield and both the medical and mental health records of Atkins, Brown, Kracht and Croci.  (Thorton Affm., Ex. A.)

[22] The *Merriweather* Consent Judgment was the result of the *Merriweather* class action, *Merriweather v. Sherwood*, No. 77 Civ. 3421 (S.D.N.Y.), which was brought in 1977 to secure better medical and mental health care at the facility, as well as improved living conditions in the form of recreational, educational, and other out-of-cell and out-of-tier activities.  A compromise was reached and a Consent Judgment was entered by the Hon. Edward Weinfeld of this Court on October 27, 1978.  *Merriweather v. Sherwood*, 518 F. Supp. 355, 356 (S.D.N.Y. 1981).  The *Merriweather* Consent Decree was vacated on July 28, 2003 by a Stipulation of Settlement and Order.  (County Defs. Reply Mem. Supp. Summ. J. at 32.)  The Stipulation of Settlement and

determined that the services provided by defendants were deficient. (Thornton Affm., Ex. A.) Dr. Harris concluded that "overall systemic deficiencies include[d] the apparent lack of seven-day-a-week mental health coverage, the inconsistency in developing written treatment plans for any inmate who is receiving ongoing mental health services and the lack of discharge planning services." (*Id.*) In addition, with respect to the care provided to each plaintiff, Dr. Harris concluded the following: (1) Atkins: "[s]ignificant problems with access to care and psychotropic medication management;" "[c]omprehensive mental health evaluation was not conducted within a time frame appropriate to the level or urgency;" and "[i]nappropriate use of punishment for inmates with mental illness"; (2) Belloto: "[l]ack of informed consent for a minor detainee;" and "[t]he psychiatric evaluation failed to demonstrate that diagnostic criteria for a major depressive disorder was present"; (3) Dawn Brown: "[s]ignificant problems with access to care and psychotropic medication;" "[m]ental health treatment was not appropriate to the level of urgency;" "[i]nappropriate use of punishment for inmates with mental illness;" and "[t]here was no evidence of systemic suicide risk assessment and monitoring for this patient with stated suicidal ideation and a suicide attempt"; (4) Kracht: "[s]ignificant problems with access to care and psychotropic medication;" "[m]ental health evaluations were not conducted within a time frame appropriate to the level of urgency;" and "[m]onitoring of medications fell below the standard of care"; (5) Grassfield: "[s]ignificant problems with access to care and psychotropic medications;" "[i]nappropriate use of punishment for inmates with mental illness;" and "[l]ack of a systemic suicide risk assessment and monitoring for detainees

Order settled "'all issues and/or claims that were or could have been raised . . . concerning the termination of the Consent Judgment *and the compliance of the defendants with the Consent Judgment*.'" (*Id.* (quoting Posner Aff., Ex. A, ¶ 73).) Consequently, all claims relating to alleged violations of the *Merriweather* Consent Decree are irrelevant to the present action and barred under the doctrine of *res judicata*.

with known suicide risk"; and, (6) Croci: "[s]ignficant problems with access to care and psychotropic medications;" and "inappropriate use of punishment for inmates with a mental illness." (*Id*.)  We note that Dr. Harris did not state any preliminary findings or conclusions with respect to plaintiff Jane Brown in her report, although she does discuss Jane Brown in her declaration annexed to plaintiffs' opposition papers.  In the declaration, Dr. Harris notes that Jane Brown "received substandard care" and that she missed several doses of her medication.  (Thornton Affm., Ex. 29 at 7-8.)

With respect to plaintiffs' allegations and Dr. Harris's report, the County defendants maintain that the alleged deprivation of mental health care was not "sufficiently serious" to warrant a finding of a constitutional deprivation nor were defendants deliberately indifferent to plaintiffs' medical needs.  (County Defs. Mem. Supp. Summ. J. at 76-77.)  Defendants note that plaintiffs admitted that "the treating psychiatrists were competent with no professional misconduct or malpractice claims against them."  (County Defs. Reply Mem. Supp. Summ. J. at 1.)  Plaintiffs also admit, by omission, "that the forensic clinic treated approximately 1,875 inmate/patients per year between 1999 and 2002 and that the percentage of inmates on psychotropic drugs for those years ranged between approximately 7.5 and 11."[23]  (*Id*. (internal citations omitted).)  In addition, plaintiffs admit that they saw a clinician on either the day of their entry to the Jail or within three days thereafter and that they had "numerous visits with clinicians, attendance at group therapy sessions, and consultations with psychiatrists."  (*Id.*)

---

[23] We also note that plaintiffs have offered no proof that forensic clinic patients were routinely over-medicated other than conclusory statements and the complaints by Menon and Berwerger which occurred prior to any of the plaintiffs' incarcerations, thereby making their alleged observations irrelevant.

We agree with defendants that plaintiffs' allegations do not rise to the level of a constitutional deprivation and reiterate that in order to survive a motion for summary judgment, plaintiffs must "do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*, 475 U.S. at 586. Once defendants carry their initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact, it is plaintiffs' responsibility to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). To defeat defendants' motion for summary judgment, plaintiffs "must do more than make broad factual allegations and invoke the appropriate statute. [Plaintiffs] must also show, by affidavits or as otherwise provided in Rule 56 . . . that there are specific factual issues that can only be resolved at trial." *Colon*, 58 F.3d at 872.

In addition, we note that "although an Eighth Amendment violation may be based upon exposure to an unreasonable risk of future harm, 'the absence of present physical injury will often be probative in assessing the risk of future harm.'" *Ross v. McGinnis*, No. 00 Civ. 0275, 2004 WL 1125177, at *9 (W.D.N.Y. Mar. 29, 2004) (quoting *Smith v. Carpenter*, 316 F.3d 178, 188 (2d Cir. 2003)). "'[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm.'" *Ross*, 2004 WL 1125177, at *9 (quoting *Carpenter*, 316 F.3d at 187). Moreover, we reiterate that "'[d]eliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.'" *Ross*, 2004 WL 1125177, at *9 (quoting *Hathaway*, 37 F.3d at 66 (citations omitted)). Further,

> [i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth

Amendment violation. Moreover, negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim.

*Ross*, 2004 WL 1125177, at *9 (quoting *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)).

Accordingly, with the above principles in mind, we will address each plaintiffs' claims separately.

### a. Atkins

In support of Atkins's claims, plaintiffs offer Dr. Harris's declaration which concludes that the medications provided to Atkins were a "woefully inadequate dosage" given the circumstances of his acutely psychotic state. (Thornton Affm., Ex. 29 at 3.) However, a disagreement over proper treatment does not give rise to a constitutional claim. In addition, although Atkins alleges that he was not treated by the mental health unit in a timely manner, the medical records reveal that he was seen by mental health and a psychiatrist within one day of admission to the Jail and was on "close watch" until mental health could see him. This demonstrates that defendants were not deliberately indifferent to Atkins's serious medical needs. With respect to the psychotic episode in question, the medical records again indicate that Atkins was seen at the clinic shortly after the incident occurred. Additionally, Atkins has failed to provide any evidence of deliberate indifference on the part of defendants other than the conclusory statement that they were deliberately indifferent to his medical needs. Consequently, Atkins's claim of deliberate indifference to his serious medical needs is dismissed.

### b. Dawn Brown

Plaintiffs maintain that Dawn Brown was subjected to substandard care in that the wrong medication was prescribed to treat her mental illness and that defendants failed to render care to her

while she was acutely manic and psychotic and dangerous to herself and others. We do not disagree that Dawn Brown had serious medical needs and required care; however, as a matter of law, the care provided to her was not so inadequate that it rose to the level of a constitutional violation. The record demonstrates that Dawn Brown was provided with mental health care upon each admission to the Jail and, if she could not immediately be seen by the mental health clinic, she was kept on "close watch" to ensure her safety and the safety of others. These facts hardly demonstrate a deliberate indifference to Dawn Brown's serious medical needs. To the contrary, the record establishes that the clinic was actively involved in providing Dawn Brown access to mental health care. Dawn Brown was never denied such care; rather, each time she had an episode as result of her mental illness, she was treated and stabilized.

Notably, Dawn Brown when asked at her deposition if there was "any other complaint about the mental health care besides that they were trying to give you Neurontin and you didn't think they should," Dawn Brown replied, "I don't really have a complaint about them that much. It's more of the other stuff." (County Defs. Mem. Supp. Summ. J. at 74 (quoting Dawn Brown Dep. at 176).) Dawn Brown later explained that by "the other stuff," she was referring to her treatment by the corrections officers. (*Id*.) This further evidences that Dawn Brown received adequate mental health care while incarcerated at the Jail.

In addition, with respect to Dawn Brown's allegations concerning her medication, it is well-settled that a complaint that a doctor was "negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106. We reiterate that "mere disagreement with prison officials about what constitutes appropriate care does not state a claim cognizable under the Eighth Amendment." *Hanton v.*

*Strange*, No. 98 Civ. 0706, 2005 WL 733873, at *8 (D. Conn. Mar. 30, 2005) (citing *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y. 1992), *aff'd*, 970 F.2d 896 (2d Cir. 1992), *cert. denied*, 506 U.S. 1040 (1992)).  Consequently, Dawn Brown has failed to state a cognizable claim against the County defendants for deliberate indifference to her serious medical needs and, accordingly, that claim is dismissed.

c.    **Croci**

Croci alleges that he received substandard care in that he did not receive on a regular basis the medications prescribed to him.  (Pls. Mem. Opp. Summ. J. at 33.)  According to plaintiffs, this was due to the fact that Croci was either refusing to take his medication, was away when the nurse brought the medications around or the medication "simply was not 'available' that day."  (*Id.*) Plaintiffs also allege that the prescribing psychiatrist was not timely informed of the missed medications which deprived Croci of having this problem resolved with alternative prescriptions or treatment.  In addition, plaintiffs contend that the severe anxiety attack that Croci suffered was a result of these missed medications.

Croci's allegations do not rise to the level of a constitutional deprivation.  First, we again note that "not every lapse in prison medical care will rise to the level of a constitutional deprivation." *Carpenter*, 316 F.3d at 184.  In addition, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay or interruption* in treatment rather than the prisoner's *underlying medical condition* alone" in determining whether the alleged deprivation was sufficiently serious.  *Id.* at 185.  Furthermore, "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical

condition, considered in the abstract" is the relevant inquiry in deciding an Eighth Amendment claim based on temporary delay or interruption of medical treatment. *Id.* at 186. Where the alleged lapses in treatment are minor and inconsequential in that they do not result in substantial risk of injury, an Eighth Amendment claim cannot be made out. *Id.* Consequently, "the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.* at 187.

With respect to Croci's claim against the County defendants, although the missed medications may have contributed to his subsequent anxiety attack, the care provided by the defendants did not pose a significant risk of serious harm. Notably, when Croci did suffer the anxiety attack he was taken to Arden Hill Hospital for treatment and received care from a psychiatrist at the forensic clinic when he returned from the hospital. These events simply do not demonstrate the deliberate indifference on the part of defendants which is necessary to liability for Eighth Amendment violations.

Moreover, with respect to Croci's missed medications, he was counseled on numerous occasions about his refusal to take the medications. This further contradicts the allegation of deliberate indifference on the part of defendants. Defendants met their responsibilities with respect to providing treatment to Croci by providing access to a psychiatrist and other clinicians when requested or necessary. In addition, with respect to Croci's claim that he was over-prescribed medication to the point of placing him in a stupor, the evidence suggests the contrary. The medical records demonstrate that Croci was an alert individual who never told his doctors that the medications were putting him in a stupor. Further, any complaint regarding the medication prescribed to Croci relates to the medical judgment of the doctors, not the quality of care provided

by the forensic clinic. Because Croci has failed to demonstrate that the County defendants were deliberately indifferent to his serious medical needs, his claims against them are dismissed.

### d. **Grassfield**

Grassfield alleges that his delayed psychiatric assessment and delayed administration of psychotropic drugs constitutes a constitutional violation of deliberate indifference to his serious medical needs. Grassfield was seen by a psychiatrist three days after he was booked by corrections, but he was referred to the mental health housing unit right away, where it was recommended that he be "monitored more closely," and he was in fact on "close watch" until he was seen by the psychiatrist. In addition, defendants note that Grassfield's two suicide attempts were not the result of substandard care as "Grassfield made numerous suicide attempts before and after his incarceration while under psychiatric care and on psychotropic drugs." (County Defs. Mem. Supp. Summ. J. at 27.)

Plaintiffs have provided no evidence to support a finding of deliberate indifference to Grassfield's medical needs. Although there may have been a delay between Grassfield's admission and his psychiatric assessment, he was on "close watch" during that time period to ensure that he did not harm himself or others. In addition, after the first suicide attempt Grassfield was immediately seen by a caseworker and a psychiatrist in the mental health unit and after the second suicide attempt he was immediately seen by medical personnel and taken to Arden Hill Hospital where he was evaluated and examined and referred to Middletown Psychiatric Center. After three days at the psychiatric center, Grassfield was returned to the Jail and was again seen by a psychiatrist who counseled him and prescribed medication. Additionally, Grassfield admitted that the discharge plan he received "was more than adequate." Although Grassfield may not have received the best care,

52

the care he did receive was not, as a matter of law, so inadequate as to rise to the level of a constitutional deprivation. Accordingly, Grassfield's claims against the County defendants are dismissed.

### e. **Kracht**

Kracht alleges that he received substandard care in that he was given medications that required monitoring though blood tests "approximately five to seven days after the first dosage," but the psychiatrist merely ordered monthly blood tests. In addition, he alleges that no changes were made to his medications even after it was determined that he was sleeping excessively. However, as noted earlier, disagreements over medications do not give rise to a constitutional claim; rather, such a claim would sound in medical malpractice. Kracht additionally alleges that he suffered severe symptoms such as "increased command auditory hallucinations and paranoid ideations," but that nothing was done to help him, other than the routine follow-up visits every three weeks with the psychiatrist. He alleges that he notified the psychiatrist of his symptoms, but the psychiatrist told him to come back in three weeks. Defendants, however, note that a review of Kracht's medical chart reveals that he was seen by a clinician/case worker on numerous occasions, consulted with a clinic psychiatrist sixteen times, participated in group therapy twenty times and that each time Kracht complained about his medication, he was seen by someone at the clinic. (County Defs. Mem. Supp. Summ. J. at 32.) In addition, defendants maintain that although the routine follow-ups with the psychiatrist were scheduled every three weeks, there were other mechanisms in place to deal with plaintiffs' mental health claims as they arose such as the use of service request forms, the ability to self-refer to mental health and permitting referrals by corrections or medical staff. (County Defs. Reply Mem. Supp. Summ. J. at 20.) This illustrates that Kracht had access to care, received care and

that defendants were not deliberately indifferent to his mental illness. There are no issues of fact surrounding Kracht's claim that, if resolved in his favor, could raise his treatment to the level of a constitutional deprivation.

Kracht also alleges that it took nine days from his arrival at the Jail until he received his medications. However, defendants respond to that allegation by noting that Kracht was on "close watch" during that period to ensure his safety and that Kracht admits that he took no action to harm himself or others during this period. Consequently, this allegation does not rise to the level of a constitutional deprivation because Kracht cannot demonstrate deliberate indifference on the part of the County defendants. Accordingly, Kracht's claims against the County defendants are dismissed.

### f.    Bellotto

Plaintiffs allege that a forensic psychiatrist diagnosed Bellotto with depression and prescribed Paxil for him, but no one informed him that he could refuse the medication. Consequently, plaintiffs contend that this psychotropic drug was prescribed for Bellotto, even though he had no need for it, to "induce a state of stupor." However, Bellotto has not alleged any facts that demonstrate that he was in a substantial risk of serious harm or that defendants were deliberately indifferent to his medical needs. If anything, defendants were conscientious with respect to Bellotto's medical needs in that they diagnosed his depression and treated him for it. Accordingly, Bellotto's claims are dismissed.

### g.    Jane Brown

Plaintiffs contend that Jane Brown's constitutional rights were violated as a result of a three-day delay after she was booked at the Jail before she was seen by the psychiatrist and the fact that on several occasions she missed doses of her medications because she was out of her cell at the time

of the scheduled administration of medications. However, Jane Brown has failed to allege how she was harmed or how defendants were deliberately indifferent to her medical needs. *See, e.g., Carpenter*, 316 F.3d at 189 (noting that "[a]lthough [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health"); *R.T. v. Gross*, 298 F. Supp. 2d 289, 295 (N.D.N.Y. 2003) (concluding that plaintiff cannot be found to have had a serious medical need where he failed to submit "any verifiable evidence indicating that a failure to treat his condition adversely affected his prognosis"); *Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 (2002) ("An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in the medical treatment to succeed."). In no way has Jane Brown alleged that the alleged deprivation of medical care was sufficiently serious to warrant a finding of a constitutional violation. The records indicate that Jane Brown saw mental health professionals whenever she put in a request and that her medication schedule was switched to evenings to accommodate her as soon as the forensic clinic was notified that she was missing some of her medications. The fact that three days passed before Jane Brown saw a psychiatrist did not result in a serious condition that could produce death, degeneration, or extreme pain, which is required to substantiate an Eighth Amendment claim. In addition, Jane Brown was able to complete her GED while incarcerated and admits that as a result of her treatment at the clinic she was "presently less depressed." Consequently, the allegations alleged by Jane Brown simply do not rise to the level of a constitutional deprivation. Accordingly, her claims are dismissed.

#### h.     Alleged Systematic Deficiencies

With respect to all plaintiffs, we note that while they allege that the care they received was substandard, the record demonstrates that they not only had access to but actually received care, thereby demonstrating that defendants were not wantonly indifferent to plaintiffs' medical needs. Although plaintiffs may disagree with the care they did receive, it did not rise to the level of a constitutional deprivation.  In addition, defendants correctly point out that the opinion rendered by plaintiffs' expert, Dr. Harris, is merely that the mental health care each plaintiff received was "substandard." (County Defs. Reply Mem. Supp. Summ. J. at 13.)  However, that does not amount to a constitutional violation: a constitutional claim requires more than medical malpractice or a "deviation or departure from accepted practice."[24]   To establish an Eighth Amendment claim, plaintiffs must establish that defendants were deliberately indifferent to a serious medical need. Based on the record, plaintiffs have failed even to establish that there is an issue of fact as to whether the County defendants were deliberately indifferent.  We also note that the fact that defendants retained a doctor in the fall of 2001 to perform quality assurance reviews, although not dispositive, further evinces that defendants were not deliberately indifferent to plaintiffs' serious medical needs. Consequently, all claims against the County defendants are dismissed.

---

[24] In addition, we note that "the opinions of experts are entitled to little weight in determining whether a condition is 'cruel and unusual punishment' under the Eighth Amendment." *Madrid v. Gomez*, 889 F. Supp. 1146, 1159 (N.D. Cal. 1995) (citing *Toussaint v. McCarthy* (*Toussaint IV*), 801 F.2d 1080, 1107 n.28 (9th Cir. 1986)).  Rather, it is appropriate to consider an expert opinion "in assessing subsidiary issues which inform the court's final determination.  For example, expert opinion may be properly considered in assessing the effects of challenged conditions or practices." *Id.* (citations omitted)

56

## III.   Motion for Severance

Defendants motion for severance is denied as moot because all claims against the County defendants have been dismissed.

## CONCLUSION

For all of the foregoing reasons, defendants' motion to preclude plaintiffs' expert testimony is denied. The partial summary judgment motion of the individual corrections officers is granted in part and denied in part. All claims against the following defendants are hereby dismissed without prejudice: Donna Dominick, David Serrano and Vincent DiChairo. All claims against the following defendants are hereby dismissed with prejudice: Michael Zappolo, Kathleen Ferreri, Michael Andricut, Daniel Figueroa and Richard Russell. Plaintiffs are granted leave to amend the Complaint within ten days from the date of this Opinion and Order to replead the failure to intervene claims with particularity to make it clear against which defendants these claims are asserted.

The summary judgment motion of defendants Chris Ashman and the County of Orange (the "County defendants") is granted and all claims against the County defendants are hereby dismissed with prejudice. Lastly, defendants' motion for severance is denied as moot.

SO ORDERED.

Dated: White Plains, New York
      June 3, 2005

                                _William C. Conner_
                                Sr. United States District Judge